## AFFIDAVIT IN SUPPORT OF AN APPLICATION
## UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Patrick Dawley, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search:

   a.   the premises known as 131 West Rosemont Avenue, Manchester, New Hampshire 03103, hereinafter "PREMISES," further described in Attachment A-1, to include all people and vehicles at the premises, and any cellphone, computer, computer media, and electronic media located therein, for the items described in Attachment B-1;

   b.   a white 2014 BMW 3-series, bearing New Hampshire registration 4806599, assigned VIN number WBA3B5G51ENS08630, registered to Jeff Taylor of 19 Ainsworth Avenue, Manchester, NH, currently impounded at Duval's Towing Service, located at 237 Mast Road, Goffstown, NH (the "SUBJECT VEHICLE"), further described in Attachment A-2, to include any cellphone, computer, computer media, and electronic media located therein, for the items described in Attachment B-2; and

   c.   the person of Daquan HENCLEWOOD (hereinafter "HENCLEWOOD"), further described in Attachment A-3, to include any cellphone, computer, computer media, and electronic media located on his person, for the items described in Attachment B-3;

2.      The applied-for warrant would authorize the forensic examination of the seized electronic equipment for the purpose of identifying electronically stored data particularly described in the applicable Attachment B.

3.      I am a Special Agent with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives (hereinafter, "ATF"), and have been since February of 2019.  I am currently assigned to the Manchester, New Hampshire Field Office in the Boston Field Division.  While training to become a Special Agent, I attended the Federal Law Enforcement Training Center (hereinafter, "FLETC") in Glynco, GA full-time for six-and- a-half months. During my time at FLETC, I received training in practices and methods of illegal firearm possessors, firearm traffickers, and related federal criminal statutes. Prior to becoming an ATF Special Agent, I was a Police Officer for the Reading, Massachusetts Police Department for approximately seven years.  As a Special Agent and Police Officer I have conducted and/or participated in a number of investigations involving state and federal firearm, controlled substance and financial fraud violations.  I have interviewed multiple victims, sources of information, witnesses, suspects, and defendants regarding various types of criminal activity.  I have also served search warrants for various crimes and have made criminal arrests for firearm and controlled substance violations. I participated in state and federal investigations involving possession of illegal weapons including firearms, improvised explosive devices and possession of controlled substances.  I also conducted numerous investigative stops and probable cause searches of people and vehicles.  I participated in physical surveillance operations and participated in the execution of state and federal arrest warrants.

4.      Based on my training and experience, I am aware that drug users and dealers, prohibited persons from possessing firearms and firearms traffickers, commonly use cellular

telephones to communicate and further their drug activities.  However, drug users and dealers are aware of law enforcement's use of electronic surveillance, and thus frequently endeavor to thwart detection by changing cellular telephone numbers, using multiple cellular phones at the same time, and/or utilizing prepaid cellular phones where the user of the phone is not required to provide personal identifying information.  I am also aware that drug users and dealers frequently "drop" or change cellular telephone numbers and cellular telephones in an effort to thwart law enforcement's use of electronic surveillance.  I am familiar with the manner in which drug users use telephone, coded, veiled, or slang-filled telephone conversations when discussing their illegal business, in an effort to further prevent detection, and that they often use text messages in lieu of phone calls to avoid speaking over the telephone.

5.      I am familiar with the facts and circumstances of this investigation from my own personal participation and from oral and written reports given to me by other members of law enforcement. Since this affidavit is being submitted for the limited purpose of establishing that probable cause exists to support the issuance of a search warrant, I have not included details about every aspect of the investigation. While this affidavit contains all the material information I am aware of that is pertinent to the requested search warrants, it does not set forth all of my knowledge about this matter.  I also am in regular contact with law enforcement who specialize in the area of wire fraud, identity theft, and cybercrime.

### **RELEVANT STATUTES**

6.      Title 18, United States Code, Section 1343 reads in pertinent part,

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or

artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

7.      Title 18, United States Code, Section 1029 reads in pertinent part,

Whoever…knowingly and with intent to defraud produces, uses, or traffics in one or more counterfeit access devices…shall, if the offense affects interstate or foreign commerce, be punished as provided in subsection (c) of this section.

8.      Title 18, United States Code, Section 922(g) reads in pertinent part,

It shall be unlawful for any person . . . who is an unlawful user of . . . any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)) . . . to . . . possess in or affecting commerce, any firearm.

18 U.S.C. § 922(g)(3).  An unlawful user of a controlled substance is someone who is a current user of a controlled substance in a manner other than as prescribed by a licensed physician, and unlawful use must have occurred recently enough to indicate that the individual is actively engaged in such conduct.  It is not required that such a person use drugs at the precise time that the person possesses a firearm.  27 C.F.R. § 478.11.

9.      Title 18, United States Code, Section 922(a)(g) reads in pertinent part,

It shall be unlawful for any person in connection with the acquisition or attempted acquisition of any firearm or ammunition from a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, knowingly to make any false or fictions oral or written statement…intended or likely to deceive such importer, manufacturer, dealer, or collector with respect to any fact material to the lawfulness of the sale or disposition of such firearm.

10.     Title 21, United States Code, Section 841(a)(1) reads in pertinent part,

Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally…to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance.

## **Probable Cause**

11.     Along with other members of law enforcement, I am conducting an investigation of HENCLEWOOD into wire fraud, fraud and related activity in connection with access devices,

and the illegal possession of firearms, the illegal possession, use and distribution of drugs, and the making a material false statement in connection with the purchase of firearms.

12.     I have learned through conversations with members of Manchester Police Department ("MPD") Anticrime Unit and through firsthand observation of open source information readily available through the internet and social media platforms that HENCLEWOOD uses the social media "handles" or login names such as "rcg_deniro" on Instagram, "RCG[dice emoji]Deniro" on Snapchat, "RCG Deniro" on YouTube, "RCG_DENiRO" on Twitter, and "RCG_Deniro" on SoundCloud.

13.     I know that HENCLEWOOD uses these accounts because the content posted to the accounts depict photographs, video and audio of HENCLEWOOD. I am familiar with and able to identify HENCLEWOOD in photographs and videos after viewing approximately hundreds of photographs and/or videos to include multiple social media accounts belonging to HENCLEWOOD and/or associates, DMV license photographs and booking photographs from prior arrests. I am familiar with the numerous different appearances of HENCLEWOOD to include varying hair lengths and styles, and other accessories to include clothing, hats and face coverings.

## OPEN-SOURCE SOCIAL MEDIA

14.     I have learned through open-source social media posts and through members of law enforcement that HENCLEWOOD has used social media to include posts of illegal activity. I have learned of the following posts through personal observation or through fellow members of law enforcement:

15.     April 10, 2018 – A post on HENCLEWOOD's Instagram account, "@rcg_deniro", depicted HENCLEWOOD holding what appeared to be large quantities of

marijuana with the caption of "NOV 22, 2017". I know that Snapchat has filters that can be
added to photographs that often populate the date or geolocation of when or where a photograph
was taken.



16.     February 17, 2018 – A post to HENCLEWOOD's Instagram depicted what
appeared to be a Military Armament Corporation ("MAC")-type pistol with an extended
magazine. The caption for the picture stated "Run up on who, you run up get your issue". I know
the term "run up" to often mean to challenge, such as a rival competing with or challenging the
illegal activity of another, such as drug distribution.



17.     March 17, 2018 – A video posted to HENCLEWOOD's Instagram depicted

HENCLEWOOD holding what appeared to be a MAC-type pistol with an extended magazine,

while smoking what appeared to be a marijuana.



18.     September 24, 2018 – A post to the Instagram account "@rcgthelabel" depicted

HENCLEWOOD and other members of RCG. In the video HENCLEWOOD was observed to be

smoking what appeared to be marijuana.



19.     January 18, 2019 – A photograph posted to HENCLEWOOD's Instagram depicted HENCLEWOOD holding a black firearm, that appeared to be similar to a Heckler & Koch MP5 rifle with an attached silencer.



20.     February 12, 2019 – A post to HENCLEWOOD's Instagram depicted HENCLEWOOD with the geolocation tag of Jersey City, New Jersey. In the video HENCLEWOOD was observed to be smoking what appeared to be marijuana.



21.     April 4, 2019 – A post to HENCLEWOOD's Instagram depicted

HENCLEWOOD attempting to place what appeared to be a MAC-type pistol with an extended

magazine into his pocket while holding a large sum of paper currency.



22.     July 23, 2019 – A post to HENCLEWOOD's Instagram depicted a table with over

approximately $3,800 in $100 US dollars, a stack of money of an unknown amount, a jar of what

appeared to be marijuana, and what appeared to be a scale. Based upon my training, knowledge

and experience, I know a scale is a tool commonly used to weigh drugs for packaging and distribution.



23.     July 23, 2019 – A post to HENCLEWOOD's Instagram depicted a close-up of marijuana and a prescription bottle with a label for 5 grams of medical marijuana, which I identified through my training, knowledge and experience. HENCLEWOOD posted numerous other photographs during the same timeframe with additional photographs depicted containers filled with readily identifiable marijuana and what appeared to be a marijuana blunt.





24.    August 6, 2019 – A post to HENCLEWOOD's Instagram depicted

HENCLEWOOD with the geolocation tag of Somerville, Massachusetts. In the video

HENCLEWOOD was observed to be smoking what appeared to be marijuana.



25.     February 4, 2020 – A post to HENCLEWOOD's Instagram depicted

HENCLEWOOD with the geolocation tag of the University of Toledo in Ohio. In the video

HENCLEWOOD was observed to be smoking what appeared to be marijuana.



26.     May 13, 2020 - A post to HENCLEWOOD's Instagram depicted HENCLEWOOD holding a pistol and pointing it in the direction of the camera with the caption "We Could Fall Out [emoji face] or you Could Just [emoji face] Fall Back". I know through my training, knowledge and experience that HENCLEWOOD's caption, in reference to pointing the firearm at the camera, meant that he would have a "fall out" or no longer be in contact with someone, or alternatively, one could "fall back", which was in reference to dying. In relation to the picture, it was indicative of the use of violence.



27.     June 4, 2020 – A post to HENCLEWOOD's Snapchat, "@blackdeniro300", depicted a video of HENCLEWOOD pointing what appeared to be a pistol with a green laser mounted under the slide and forward of the trigger guard. The location was identified as "Manchvegas," which I know to refer to Manchester, New Hampshire.  HENCLEWOOD was observed wearing three gold necklaces, a gold bracelet and a gold ring during the video.



28.     June 13, 2020 - A post to HENCLEWOOD's Instagram depicted

HENCLEWOOD holding a dark-colored bottle that appeared similar to a prescription bottle,

commonly used for codeine and promethazine cough syrup. I know through my knowledge,

training and experience that codeine and promethazine cough syrup is commonly referred to as

"lean". The post was captioned in part "I Just spilled Some Lean".



29.     In the post, HENCLEWOOD appeared to be holding an item similar to a marijuana blunt and was observed blowing smoke from his mouth. HENCLEWOOD was observed wearing a necklace with the letters RCG.

30.     June 19, 2020 – A post to HENCLEWOOD's Instagram depicted HENCLEWOOD with a black pistol in his hand and a large amount of $100 US dollar bills at his feet.



31.     September 8, 2020 – A music video posted to HENCLEWOOD's YouTube account, "RCG Deniro", depicted HENCLEWOOD smoking what appeared to be marijuana.



32.     December 23, 2020 – A post to HENCLEWOOD's Snapchat depicted HENCLEWOOD holding what appeared to be two Glock pistols of unknown models, one with an extended magazine and the other without a magazine.



33.     April 19, 2021 - A post to HENCLEWOOD's Snapchat depicted a video of a glass firearms display at Wildlife Sport Outfitters, located at 2188 Candia Road, Manchester, New Hampshire, which I readily identified by the sales tags attached to the Glock pistols depicted in the video.



34.    April 26, 2021 – A post to HENCLEWOOD's Snapchat depicted a photograph of what appeared to be a Glock pistol with a single stack Glock magazine with the caption "I could get you Shot and packed up,and dats on da Set".



35.    I observed the single-stack magazine in the video had the Glock logo at the lower portion of the rear of the magazine, which I know through my knowledge, training and experience to be indicative of a Glock factory-made magazine. I observed the magazine in the video to have a visible round of ball ammunition and the capacity of 10-rounds by the eight

circle cutouts in the rear of the magazine, known as numbered witness holes. Glock factory-made magazines have numbered witness holes that begin at the number "3" and go up numerically to the highest capacity number. I know through my knowledge, training and experience that Glock has only manufactured one single-stack 10-round magazine compatible with the Glock Model 43X and Model 48, 9mm pistols.

36.     I know through my knowledge, training and experience that "packed up" is slang often used to refer to murder or death, in reference to being put into a body-bag or casket. I also know that "da Set" is slang often used to refer to "the gang" that a person affiliates and/or belongs to. I know that the phrase "dats on da Set" to mean "that's on the set [gang]", in reference to the reputation of HENCLEWOOD's gang, RCG, and their reputation for violence, shooting involvements and suspected homicides.

37.     April 26, 2021 - A post to HENCLEWOOD's Snapchat depicted a photograph of a black firearm, that appeared similar to that of a Glock pistol, in the left front pants pocket of HENCLEWOOD with the caption "ANOTHER DAY, ANOTHER DOLLAR".



38.     May 18, 2021 – A post to HENCLEWOOD's Snapchat depicted a photograph of a dinner receipt for $348.94 with the caption "Who got Zaza get with me" and "Hit me". I know through my knowledge, training and experience that "Zaza" is slang for marijuana. I also know that "get with me" and "Hit me" was in reference to HENCLEWOOD requesting to purchase marijuana from someone.

39.     May 19, 2021 – A post to HENCLEWOOD's Snapchat depicted a photograph of a black pistol, that appeared similar to that of a Glock pistol, and thirty-five (35) rounds of Federal brand, full metal jacketed ammunition of an unknown caliber. I observed the photograph to contain ten (10) loose rounds on a table and twenty-five (25) rounds in the plastic insert next to the box, which I know through my training, knowledge and experience to be the similar to common, readily available, commercially manufactured ammunition. The caption to the post read "In the woods".



40.     July 1, 2021 – A post to HENCLEWOOD's Snapchat depicted a close-up of marijuana, which I readily identified through my training, knowledge and experience, with the caption "great smokes".



41.     July 10, 2021 – A post to HENCLEWOOD's Snapchat depicted a close-up of marijuana, which I readily identified through my training, knowledge and experience.



42.     July 12, 2021 – A post to HENCLEWOOD's Snapchat depicted text that read "This nigga Think he Pullin up to fight Me, But I'm gon Wack him[fireworks emoji]". I know through my training, knowledge and experience that the term "Pulling up" is in reference to an

ambush or approaching with the intent for violence. I also know that "Wack" or "Whack" is in reference to murder. I know that persons commonly use the firework emoji in reference to gun shots.



### **DOMESTIC VIOLENCE ARREST – FIREARM AND MARIJUANA LOCATED**

43.      I learned from MPD report #18-010677 and in speaking with involved law enforcement, that on July 16, 2018 at approximately 10:30 AM, MPD responded to the PREMISES for a 911 hang-up call, reported by HENCLEWOOD's grandmother for an alleged domestic violence altercation. Upon arrival, MPD personnel were directed to the basement of the PREMISES were HENCLEWOOD resided. MPD personnel cleared the basement to search for individuals and observed marijuana, drug paraphernalia, drug packaging material, a SWD M11/9 9mm MAC-type pistol with an extended magazine, bearing serial number 89-0009322, commonly identified and referred to as a Cobray MAC-11, in HENCLEWOOD's bedroom. HENCLEWOOD and his girlfriend, Annais Bonilla Torres were not initially located. MPD located Ms. Bonilla Torres in the vicinity and Ms. Bonilla Torres was uncooperative with law enforcement. During the incident, HENCLEWOOD was on the phone with Ms. Bonilla Torres

and was hostile with law enforcement. HENCLEWOOD stated he refused to come back to the house with MPD present and stated that marijuana was not illegal and that there was less than 7 grams in his bedroom. A red cup containing an unknown white powder with a razor blade in the cup was located but could not be positively identified. As a result, MPD seized approximately 7.4 grams of the unknown white powder and approximately 4 grams of marijuana. According to the report, the firearm was not seized.

44.     On July 24, 2018 an arrest warrant was issued for HENCLEWOOD for domestic simple assault as a result of the July 16, 2018 incident. On August 31, 2018, HENCLEWOOD was arrested by the Merrimack, New Hampshire Police Department while attempting to purchase a firearm from Merrimack Firearms, a federal firearms licensee. On October 19, 2018 the case received a Nolle Prosequi disposition in the Manchester, New Hampshire District Court.

**ATTEMPTED FIREARMS PURCHASE**

45.     According to Merrimack PD reports #616783 and #617449, on August 31, 2021, Merrimack Firearms, located at 280 Daniel Webster Highway, Merrimack, New Hampshire reported a denial of the sale of a firearm. The attempted purchaser was identified as HENCLEWOOD. The New Hampshire State Police Licensing and Permitting denied HENCLEWOOD's criminal history check due to an apparent active restraining order. Upon further review after the fact of the attempted purchase, it was determined that the restraining order had not yet been served to HENCLEWOOD at the time of the attempted purchase and no further judicial action was pursued.

## STATE SEARCH WARRANT OF HENCLEWOOD'S VEHICLE AND THE PREMISES

46.     I learned from MPD report #18-015233 and in speaking with involved law

enforcement, that on October 3, 2018 at approximately 8:08 PM, MPD patrol initiated a motor

vehicle stop on a 2010 white Nissan Altima, bearing New Hampshire registration 3041P,

registered to and was operated by HENCLEWOOD. As a result of interaction, HENCLEWOOD

was found in possession of marijuana, two bundled amounts of currency, totaling approximately

$2,305.00, which according to the report, based upon MPD Officer Bates training, knowledge

and experience was consistent with drug transactions and sales. The vehicle and currency were

seized and secured at MPD Headquarters, pending a state search warrant.

47.     On October 12, 2018, MPD Officer Bates applied for and was granted a state

search warrant for the Nissan Altima by the Honorable Judge William Lyons of the 9th Circuit

District Division in Manchester, New Hampshire.

48.     As a result of the search warrant, 3.7 grams of marijuana was located in the

passenger compartment and 27.7 grams of marijuana was located in the trunk. A black .40

caliber pistol magazine for an unspecified make or model was located in the glove box along

with the user manual for a Kel-Tec PLR-16 5.56 mm NATO caliber SU-16-variant pistol. A

handwritten bill of sale, dated September 5, 2018, for HENCLEWOOD's private sale purchase

of a Kel-Tec PLR-16 5.56 mm NATO caliber pistol, bearing serial number P3Y18, was located

in the center console. The items were photographed, seized and secured into MPD evidence.

49.     I know through my knowledge, training and experience that drug dealers often

utilize firearms in conjunction with the distribution of drugs in order to protect their drug supply

and monetary profits earned from drug distribution. I also know that persons who utilize firearms

in support of illegal activity, such as drug distribution, frequently brandish firearms and openly

share in regard to being in possession of, and using firearms, such as through the use of social

media. I know that gang members and drug dealers utilize firearms to bolster their credibility

within their social network and community to instill fear and build their reputation.

50.     On October 17, 2018, HENCLEWOOD was arrested by MPD on a warrant for

the Possession of Controlled Drugs and Violation of Bail Conditions, as a result of the October 3,

2018 motor vehicle stop and October 12, 2018 search warrant of HENCLEWOOD's vehicle.

51.     I learned from MPD report #18-016016 and in speaking with involved law

enforcement, that on October 17, 2018, MPD Special Enforcement Division (hereinafter, "MPD

SED") applied for and were granted a state search warrant for the PREMISES by the Honorable

Judge William Lyons of the 9th Circuit District Division in Manchester, New Hampshire.

52.     As a result of the search warrant, MPD SED located approximately 18.6 grams of

suspected heroin, which was tested using the NARK KIT 20033, which gave a presumptive

positive result for fentanyl. The fentanyl was located on a shelf in the basement common area

directly next to HENCLEWOODS bedroom. MPD SED also located multiple bags of marijuana

in and around the basement and in HENCLEWOOD's room, amounting to approximately 42

grams. In HENCLEWOOD's bedroom, MPD SED located a drawer containing

HENCLEWOOD's New Hampshire Driver's License, a 9mm round of ammunition, a 9mm

magazine of an unknown make and model and a pistol holster. An additional round of 9mm

round of ammunition and an additional pistol holster were also seized from HENCLEWOOD's

bedroom.

53.     I learned from MPD Detective Eric Joyal that HENCLEWOOD was not charged with Possession of Fentanyl at that time due to the manner in which the fentanyl was located.

54.     On October 23, 2018, HENCLEWOOD pleaded guilty to possession of marijuana in the Manchester, New Hampshire District Court.

**FICTIOUS CHECK DEPOSIT AND IMMEDIATE WITHDRAWAL OF CASH**

55.     I learned through Digital Federal Credit Union (hereinafter, "DCU") bank records for account ending in 002, in the name of HENCLEWOOD (the "Account"), that on or about December 23, 2020, a check, bearing check number 182385633, issued on December 8, 2020 by Allstate Insurance Company for $7,121.55 was deposited into the Account.  DCU records indicate that this was a "mobile deposit."  I understand this to mean that an individual used a mobile device to take a picture of the check and upload it through the bank's mobile application. I know, from my training and experience, that persons involved in financial fraud often use the mobile deposit feature due to the check being reviewed and scrutinized at a later time after the deposit, after cash funding is able to be withdrawn. I know that persons involved in scams and money laundering try to minimize risk of being identified or caught with fictious instruments, and often know that fraudulent checks are more likely to be scrutinized by a bank teller, who would be able to associate the person depositing the check with the illegal activity.

56.     I learned at the time of the deposit, the check appeared to be made out to HENCLEWOOD at the PREMISES address. I learned that $6,880.00 was withdrawn from the Account the following day on December 24, 2020 in Houston, Texas.  Following that withdrawal, the Account had a balance of $9.97. I know through social media posts and bank records that HENCLEWOOD was in Houston, Texas during the timeframe of the events.

57.     On December 29, 2020, DCU returned the amount to Allstate due to finding the check was altered and was fictitious due to insurance claim information and the check being addressed to a documented claimant and not HENCLEWOOD. I learned from bank records that DCU debited $7,121.55 from the Account, resulting in a loss to DCU bank. I learned the Account had been over-drafted on December 28, 2020 and never accessed by anyone other than the bank after that date.

58.     I learned through insurance claim information that the check was issued as a result to a motor vehicle accident on February 8, 2019 in Johnston, Rhode Island, and that HENCLEWOOD was not a claimant or known to be involved in the incident.

## FRADULENT USE OF CREDIT CARDS

59.     I learned from MPD report #21-005252 and in speaking with involved law enforcement that on April 21, 2021, MPD received a report from Tulley BMW, a BMW vehicle dealership and repair center located at 170 Auto Center Road, Manchester, New Hampshire, of fraudulent use of five credit cards between approximately March 5, 2021 and March 11, 2021. The employee and reporting party stated repairs had been made to a white 2014 BMW 3-series, assigned VIN number WBA3B5G51ENS08630, the SUBJECT VEHICLE, on behalf of a caller identified as "Jeff Taylor". I know through personal observation, police reports, DMV records and witness statements that the SUBJECT VEHICLE was primarily operated by HENCLEWOOD and was regularly parked at the PREMISES.

60.     According to the report, on March 3, 2021, the SUBJECT VEHICLE was brought to the dealership by a young black male, who provided the name "Victor Bailey", which was not verified by a form of identification, and the phone number 213-275-6838, and underwent approximately $11,150.37 in repairs. According to the dealership records, the appointment was

26

booked under the name "Jeff Taylor". On March 3, 2021, "Victor Bailey" told the dealership he had caused the damage while operating the vehicle and requested to use the online service myKaarma to pay for the repairs through the help of family members. On March 5, 2021, a down payment of $7,638.12 was made via the myKaarma website, using Chase credit card ending in 2176, in the name of Katharine Banerjee.

61.     On March 11, 2021, the remaining balance of $3,512.28 was paid for in four (4) separate payments Chase credit card ending in 7042, in the name of Debra Hayworth. According to records obtained from myKaarma, an initial credit card payment was conducted online for $671.16 was attempted and declined from IP address 172.58.235.133. I learned the IP address was associated with a device using T-Mobile as an internet service provider, in or around East Orange, New Jersey. I learned a manual payment attempt of the same amount of $671.16 was attempted and declined from IP address 70.88.216.233, which belonged to Tulley BMW. According to the records a successful payment of $169.95 was conducted from IP address 76.188.142.9 from a device using Comcast Business as an internet service provided, in or around Manchester, New Hampshire. Next, three successful payments were made for $730.44, $2,469.11 and $142.78 from IP address 172.58.230.240 from a device using T-Mobile as an internet service provided, in or around the Bronx, New York. I know through social media posts from HENCLEWOOD, that he frequents New York City and Northern New Jersey.

62.     I know from commonly utilized databases, that the phone number 213-275-6838, provided by "Victor Bailey" to Tulley BMW, is a registered Los Angeles, California based T-Mobile number. I know from commonly utilized databases, the phone number 419-322-1815, provided by "Jeff Taylor" to Tulley BMW, is a registered Toledo, Ohio based T-Mobile number.

I know through social media posts from HENCLEWOOD, that he frequents both Los Angeles, California and Toledo, Ohio.

63.     The vehicle was released on or about March 11 or 12, 2021, to the same male, who provided the name "Victor Bailey". On April 21, 2021, Chase Bank informed the dealership that the five payments made on behalf of the SUBJECT VEHICLE repairs were reported as fraudulent and the money was returned to the card holders.

64.     I learned through the dealership records that on November 23, 2020, the SUBJECT VEHICLE was brought to the Nashua, New Hampshire location of Tulley BMW under the name "Jeff Taylor" and repairs were made and paid for in cash and by debit card of $535.35.

65.     I know through Digital Federal Credit Union bank records, obtained pursuant to this investigation, for HENCLEWOOD's account ending in 9591, that on November 24, 2020, HENCLEWOOD's account posted a transaction for $535.35 at "TULLEY BMW RECEPTION".

66.     On April 23, 2021, I learned MPD Detectives interviewed Jeff Taylor and learned he was asked by a friend named "Daquon" who lived with his mother and grandmother near Elmwood Street, Manchester, NH, with the phone number 213-275-6838, had asked him to register the vehicle in Mr. Taylor's name, however the vehicle was operated by "Daquon" and kept at the PREMISES. I believe "Daquon" to be HENCLEWOOD given the unique name, proximity to the PREMISES and the accurate statements regarding living with his mother and grandmother. I know that the PREMISES was located a street over from Elmwood Street. I know through the City of Manchester Tax Assessor's that the PREMISES was owned by HENCLEWOOD's mother. I know through members of MPD and police reports that HENCLEWOOD's grandmother resided at the PREMISES. I know that the phone number Mr.

Taylor provided to MPD Detectives was the same phone number "Victor Bailey" provided to Tulley BMW. I know that persons often provide fictious names to avoid detection by law enforcement while committing crimes. Therefore, I believe that "Victor Bailey" was in fact HENCLEWOOD.

67.     I learned on April 23, 2021, Tulley BMW received a call from a male identified by name as "Jeff Taylor", from phone number 508-784-7714, who stated they would make installment payments for the money owed for the repairs. A short time later, a male who stated he was "Jeff Taylor", arrived operating the SUBJECT VEHICLE at the dealership to offer approximately $2,000.00 to $2,500.00 cash as an installment payment. According to the report, the male was readily identified by an employee as the male who dropped off and picked up the SUBJECT VEHICLE in March 2021, who had previously identified himself as "Victor Bailey", who I believe to be HENCLEWOOD. The dealership declined to accept the cash and the male, who I believe to be HENCLEWOOD, exited the dealership in the SUBJECT VEHICLE.

68.     On July 26, 2021, MPD Detective Mefford and I conducted a photo array with Brian Bourassa, a Tulley BMW employee who had assisted "Victor Bailey" at Tulley BMW and had identified "Jeff Taylor" on April 23, 2021 as the same male, who previously identified himself as "Victor Bailey". Mr. Bourassa positively identified HENCLEWOOD as "Victor Bailey" and "Jeff Taylor" who had dropped off, picked up and attempted to cash pay for the SUBJECT VEHICLE.

69.     I know that persons fund illegal activity through the use of scams and money laundering such as the fraudulent use of credit cards and identity theft. I know that persons involved in illegal activity often use cash as a means of payment to avoid detection by law enforcement.

70.     I know that persons involved in schemes such as identity theft and credit cards often facilitate their operations and participation through the use of electronic devices such as smartphone cellphones, tablets, laptops and computers.

71.     On May 15, 2021, I observed a post to HENCLEWOOD's Snapchat account which depicted a screen of what appeared to be a laptop. I believed it to be a laptop due to the function keys, commonly referred to as "F-keys", in close proximity to the screen, as well as the use of a tabbed web-browser. I know a tabbed web-browser is most commonly used on computers and laptops.

## ATF FORM 4473 – ILLEGAL PURCHASE

72.     I learned through open-source social media posts by HENCLEWOOD that on April 19, 2021, he posted a video which depicted the inside of Wildlife Sports Outfitters (hereinafter the "FFL"), a federal firearms licensee, located in Manchester, New Hampshire. I contacted the FFL and learned HENCLEWOOD purchased a Glock 43X 9mm pistol, bearing serial number BTFK688. I obtained a copy of the ATF Form 4473 that HENCLEWOOD filled out, signed and dated on or about April 19, 2021. I observed HENCLEWOOD answered "No" to Question 21.e., which asks, "Are you an unlawful user of, or addicted to, marijuana or any depressant, stimulant, narcotic drug, or any other controlled substance? Warning: The use or possession of marijuana remains unlawful under Federal law regardless of whether it has been legalized or decriminalized for medicinal or recreational purposes in the state where you reside".

73.     According to the ATF Form 4473, HENCLEWOOD listed his home address as the PREMISES and the firearm was transferred to HENCLEWOOD on the same day from the

FFL. According to employees of the FFL, HENCLEWOOD also purchased a box of 50 rounds of 9mm ammunition.

74.     I know through my training and experience that users of illegal drugs, to include marijuana, who seek to obtain firearms will often knowingly answer "no" to questions regarding drug use, in violation of Title 18 U.S.C. 922(a)(6), knowing that such an answer is difficult to refute through the background check process, in order to obtain immediate possession of the firearm for nefarious means, to include violent crimes and firearms trafficking.

75.     I learned through a review of the video surveillance footage from the FFL that on April 19, 2021 at approximately 3:39 PM, the SUBJECT VEHICLE arrived at the FFL, operated by a male, who I readily identified as HENCLEWOOD, with an unknown black male passenger. I observed HENCLEWOOD enter the store and immediately walk to the glass pistol display in the back room of the FFL. According to the FFL employees, HENCLEWOOD and the unknown black male had previously visited a few days prior and had inquired about Glock pistols but did not buy anything at that time. I observed surveillance video of HENCLEWOOD appear to fill out, what was later confirmed from FFL employees to be, the ATF Form 4473. At approximately 4:01 PM, HENCLEWOOD walked to the cashier and produced a large sum of cash from a fanny pack. HENCLEWOOD paid for the Glock 43X 9mm pistol and a box of ammunition, which he received in a black pistol box and left the store. The FFL stated they did not have a copy of the receipt. I observed the cashier did not photocopy the receipt before providing it to HENCLEWOOD. I observed HENCLEWOOD and the unknown black male sat in the SUBJECT VEHICLE for approximately seven minutes before backing out and leaving the FFL parking lot. In that time, it appeared HENCLEWOOD and the unknown male were manipulating the firearm.

## **UNEXPLAINED SPENDING HABITS**

76.    I observed HENCLEWOOD to post lavish spending habits via social media platforms. I know through bank records obtained through a Federal Grand Jury and MPD booking records that HENCLEWOOD has listed his employment as a student or as unemployed. On October 3, 2018, HENCLEWOOD admitted to MPD officers that he was no longer a student and was focusing on his music career. HENCLEWOOD does not have an explainable mean of income to coincide with the spending habits he depicted via social media.

77.    On March 14, 2021, I observed a post to HENCLEWOOD's Snapchat account of keys to a BMW vehicle. I had previously observed numerous posts on HENCLEWOOD's social media in which HENCLEWOOD was operating a dark colored BMW SUV dating back to June 2020.



78.    On May 18, 2021, I observed a post on HENCLEWOOD's Instagram account dated approximately February 12, 2019, depicted a large sum of cash at what appeared to be a Jeweler with the caption "New iCe on da way". I observed the post was part of a series of videos

titled "NY/NJ" in reference to being filmed in or around New York and New Jersey. I know through my knowledge, training and experience that "ice" is a slang term for jewelry. I know that members of RCG all wear matching diamond-encrusted necklaces with a diamond-encrusted pendent of the letters "RCG".



79.     On May 18, 2021, I observed a post from the Instagram account "@al_jeweler", belonging to Al "Al the Jeweler" Bekdas of Labelle Jewelry, located in Totowa, New Jersey. I know that Al the Jeweler is a celebrity jeweler commonly used by professional athletes and musicians to further their reputation and to obtain jewelry as a symbol of fame and wealth. In the post, dated March 2, 2019, I observed a hand holding two diamond-encrusted "RCG" pendants. The caption read "RCG @rcg_melo @rcg_deniro". I know the Instagram handles in the caption to belong to HENCLEWOOD and Trevon MAUGHN.



80.     Since the beginning of 2021, I observed HENCLEWOOD to post numerous
videos and photographs via multiple social media platforms to include Instagram and Snapchat
depicted extravagant dinners and drinks to include but not limited to a $1,985.77 dinner on or
about January 25, 2021 at an unknown restaurant, and a $2,046.38 dinner on April 24, 2021 at
Mooo, an exclusive, private dining venue located in Boston, Massachusetts. I observed
HENCLEWOOD made frequent trips to Massachusetts and would post videos inside of
restaurants and of high priced meals and drinks. On May 18, 2021 I observed HENCLEWOOD
posted a $258.94 receipt for a meal in which he wrote in an additional approximate 34% tip of
$90.00. On May 20, 2021, I observed HENCLEWOOD posted a bottle of Dom Perignon
champagne to Instagram at the same time he posted photographs of dinner. I know a bottle of
Dom Perignon is worth approximately $185.00. I observed HENCLEWOOD to post on
numerous occasions via social, to include on May 21, 2021, a bottle of Don Julio 1942 Anejo
Tequila, worth approximately $130.00.

81.     On June 6, 2021, I observed HENCLEWOOD posted on his Snapchat account a photo of a box of an Apple Watch Series 6 with the caption "ON GO MODE". I know that an Apple Watch Series 6 is worth approximately $429.00 to $529.00.

82.     On June 12, 2021, I observed HENCLEWOOD posted a photo on his Instagram account with the caption "10k on da Wake up". I know through my training, knowledge and experience that "10k" is commonly used to refer to $10,000.00. I also know that persons post financial related content via social media as a means of credibility and reputation.



83.     On July 21, 2021, I observed HENCLEWOOD's SoundCloud online music sharing account had a total of approximately 119,763 total streams in the two (2) years HENCLEWOOD has posted content to it. I know through my training, knowledge and experience that persons who qualify as monetized streamers for online music sharing accounts such as SoundCloud or Spotify earn approximately $0.0025 to $0.004 per stream. If HENCLEWOOD were to be eligible to make money from SoundCloud, he would have possibly earned approximately $299.41 to $479.05 in the past two years.

84.     On July 21, 2021, I observed HENCLEWOOD's YouTube account had a total of approximately 58,966 total views since it was created on June 20, 2018. I know through my training, knowledge and experience that persons who qualify as monetized YouTube accounts earn approximately $0.003 to $0.005 per view. If HENCLEWOOD were to be eligible to make money from YouTube, he would have possibly earned approximately $176.90 to $294.83 since the inception of the account.

85.     Based upon my training, knowledge and experience, the frequency and extravagant cost of the meals, drinks and items consumed and depicted by HENCLEWOOD, would require a significant amount of money. Based upon the aforementioned records, HENCLEWOOD has no explainable, legal means to maintain and pay for the lifestyle.

## THE SUBJECT VEHICLE - WHITE 2014 BMW 3-SERIES

86.     I know through speaking with members of MPD, and reviewing law enforcement reports and documentation that HENCLEWOOD is known to utilize and have access to the SUBJECT VEHICLE, a white 2014 BMW 3-series, bearing New Hampshire registration 4806599, assigned VIN number WBA3B5G51ENS08630, registered to Jeff Taylor of 19 Ainsworth Avenue, Manchester, NH. I learned from MPD Report #21-005252, that the registered owner of the vehicle, Jeff Taylor, admitted to MPD Detectives during an unrecorded telephonic interview that HENCLEWOOD asked Mr. Taylor to register the SUBJECT VEHICLE in Mr. Taylor's name. Mr. Taylor stated he did not drive the SUBJECT VEHICLE and that it was kept at the PREMISES. I learned from the New Hampshire DMV records that Mr. Taylor registered the SUBJECT VEHICLE on or about September 8, 2020 and that the SUBJECT VEHICLE was purchased on or about July 17, 2020.

87.     I learned through a CarFax vehicle history report of the SUBJECT VEHICLE that on December 14, 2020 and May 5, 2021, the SUBJECT VEHICLE received an oil change at Take 5 Oil Change, located in Houston, Texas. The CarFax report showed the SUBJECT VEHICLE acquired approximately 23,019 miles and 18,108 miles each in a five-month period leading up to the oil changes. I know through my training, knowledge and experience that the average individual drives approximately 10,000 to 12,000 miles in a primarily operated vehicle. HENCLEWOOD posted videos to his Instagram account on approximately February 2, 2021 and April 27, 2021, where the SUBJECT VEHICLE, readily identified by the license plate and/or inspection sticker, was observed with the geolocation tag of Houston, Texas.

88.     I learned from MPD Report #21-005157, dated April 19, 2021, that the SUBJECT VEHICLE was used to meet a food delivery driver after the food purchased was done so through a fraudulent use of a credit card. The reporting party stated a male, who identified himself as "Josh Serry" from phone number 508-784-7714, had purchased food multiple times and requested to pay using a credit card over the phone and has provided multiple credit cards for each purchase. I know that the phone number of 508-784-7714 was a phone number used by HENCLEWOOD on April 24, 2021, who identified himself as "Jeff Taylor" to Tulley BMW.

89.     The reporting party stated the caller had been hesitant to provide all of the information required to pay over the phone and refused to verify the name on the credit card. The delivery driver reported delivering the food to the address of 629 Brown Avenue, Manchester, NH to a male waiting in the SUBJECT VEHICLE. The reporting party stated he observed the SUBJECT VEHICLE to depart after receiving the food and drive approximately one block to an address described as "13 W Rosemont". I know through the City of Manchester Tax Assessor's Office that there is no such address as 13 West Rosemont, and I believe the "13" listed in the

report to be a typographical error for "131" as in 131 West Rosemont, the PREMISES.

90.    On May 19, 2021, I observed the SUBJECT VEHICLE parked in front of the PREMISES while conducting surveillance with members of the MPD Anticrime Unit.

91.    On July 20, 2021, I observed HENCLEWOOD in the driveway of the PREMISES with no vehicles parked on the street or in the driveway.

92.    On July 26, 2021, I observed HENCLEWOOD had a New Hampshire Driver's License #NHL10682999, which was suspended on or about July 25, 2021. I observed HENCLEWOOD's listed address to be the PREMISES, 131 West Rosemont Avenue, Manchester, New Hampshire.

93.    On July 28, 2021, I learned from New Hampshire State Police (hereinafter, "NHSP") Report #B21-06469, that on May 21, 2021 at approximately 7:58 PM, Trooper Thomas Skafidas responded to a report of erratic operation and a single motor vehicle accident of the SUBJECT VEHICLE on the Everett Turnpike Northbound at Exit 13 in Bedford, New Hampshire. During the incident, HENCLEWOOD admitted to being the operator of the SUBJECT VEHICLE and was found to have $6,626.00 in cash on his person and approximately one ounce of marijuana. As a result of the investigation HENCLEWOOD was arrested for Possession of a Controlled Substance and the vehicle was towed to NHSP Troop B Barracks in Bedford, New Hampshire, pending a State Search Warrant.

94.    On May 24, 2021, the State Search Warrant for the SUBJECT VEHICLE was applied for and granted by the Honorable Judge Mark Derby of the 6th Circuit District Division in Merrimack, New Hampshire.

95.    As a result of the State Search Warrant, NHSP seized a marijuana cigarette, a Glock, Model 43X, 9x19mm pistol, bearing serial number BTFK688, containing a 10-round

magazine and ten (10) 9x19mm rounds of ammunition, as well as burglarious tools, discarded

retail security tags and over $1,000.00 in stolen merchandise, to include luxury handbags, Apple

Airpods and jewelry.

96.     On May 29, 2021, the vehicle was released to Duval's Towing Service, located at

237 Mast Road, Goffstown, New Hampshire, where it presently remains.

## TRAINING AND EXPERIENCE CONCERNING ITEMS TO BE SEIZED

97.     Based upon my training and experience, as well as the collective knowledge and

experience of other agents and police officers involved in the investigation, I am aware that drug

traffickers and users very often store controlled substances, firearms, and other tools of the drug

trade in their homes, automobiles, garages or outbuildings on their properties, basements, or

other places under their immediate control. I am aware that it is generally a common practice for

drug traffickers and users to store their drug inventory and drug-related paraphernalia including,

but not limited to, scales, plastic baggies, wrapping material, paper or plastic bundles, and zip

lock bags, in residences or other locations they access with frequency.

98.     It is generally a common practice for drug traffickers to maintain in hard copy or

on computers or other electronic devices, records relating to their drug trafficking activities.

Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled

substances to their clients, or alternatively, will be "fronted" controlled substances from their

suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such

records will also be maintained close at hand so as to readily ascertain current balances.

99.     Drug traffickers as well as those involved in wire fraud and fraud and fraud and

related activity in connection with access devices will commonly maintain records and

documents which provide a paper trail for money laundering of illicit drug trafficking proceeds

and illegal proceeds from wire/access device fraud, often long after the actual transactions. There are many reasons why an individual will generally maintain records for long periods of time. One reason is that the records will often seem innocuous because of their nature (e.g. financial, credit card and banking documents, travel documents, receipts, client lists, documents reflecting purchases of assets, personal calendars, telephone and address directories, check books, videotapes and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone bills, keys to safe deposit boxes, packaging materials, computer hardware and software). Second, the individual may no longer realize he/she still possesses the records or may believe law enforcement could not obtain a search warrant to seize the evidence. Lastly, it is common for individuals to set aside or store such records, and because they generally have no immediate need for the records, they are often forgotten. To law enforcement, however, all these items may have significance and relevance when considered in light of other evidence. In addition, because individuals who purchase firearms typically drive to a gun shop or other location to complete the sale, often there is evidence related to the acquisition or possession of firearms in vehicles. This may include receipts or boxes that may seem innocuous in their nature and which the individual may no longer realize he/she still possesses.

100.   Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business. Drug traffickers may also keep lists of customers, the cars they drive, and the phones they use in order to keep track of them. They may also collect court papers and other documents about customers who they believe may be cooperating with law enforcement authorities in order to protect themselves or attempt to intimidate potential cooperators.

Similarly, drug users often maintain telephone and address listings of sources of supply and keep them immediately available in order to obtain drugs when needed. Moreover, drug users must maintain telephone and other information relating to their suppliers in order to purchase drugs and support their habit.   In addition, because drug deals often take place in vehicles or drug dealers and users travel to drug deals in vehicles, records related to drug dealing, such as ledgers and records of sales are often found in vehicles.

101.    Similarly, those involved in wire fraud and fraud and fraud and related activity in connection with access devices may maintain records of how they obtained access cards, checks, and other information about fraud victims available in their homes, on their person, or in their vehicles in order to efficiently use these checks or access devices.  In this investigation, for example, HENCLEWOOD likely had the fraudulent check on his person in order to use a mobile application to upload it to the bank's mobile banking application.  Similarly, he likely had access cards in the names of others close on hand when attempting to use them to make payments over myKaarma.

102.    It is also a generally common practice for drug traffickers and those involved in wire fraud and fraud and related activity in connection with access devices to conceal at their residences or other places they access frequently large sums of money, either the proceeds from unlawful activities or monies to be used to purchase controlled substances. Individuals who distribute controlled substances often use cash or readily transported assets which are used as cash equivalents like pre-paid debit cards, gift cards, bearer bonds, gold, diamonds, or jewels because of the illegal nature of the transactions and to lessen the possibility of a financial paper trail. In this case, Additionally, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. They may also use banks and wire

companies, both foreign or domestic, to launder and transfer funds to co-conspirators. They may also use shipping companies and keep records of shipments of goods bought with drug proceeds. Records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences. I know that drug traffickers in general purchase expensive jewelry with drug proceeds. They may keep this jewelry, and records and receipts of those purchases in their residences. They may also keep records of real estate transactions, money received from rental properties, and other such documents in their residences. Similarly, individuals who withdraw large sums of cash after depositing a fraudulent check into their bank account may purchase expensive jewelry with proceeds of the wire fraud.

103.    Based on my training and experience, I know that individuals involved in the distribution of controlled substances and users may attempt to hide the true identity of their residence and, further, employ methods of surveillance at such residence in order to evade law enforcement. Typically, these individuals will maintain at their residence documents relating to the identity of the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys. I know that drug traffickers often use storage units to store drug proceeds and that keys or records of these units may be kept in residences.

104.    They may also maintain surveillance systems of their residences. Surveillance systems may capture evidence of meetings between distributors and customers and/or coconspirators, shipments of drugs, or other meetings relevant to drug transactions.

105.    Typically, drug traffickers possess firearms and other dangerous weapons to protect their profits, supply of drugs, and persons from others who might attempt to forcibly take the traffickers' profits and/or supply of drugs. Often, drug users obtain firearms in order to trade with their source of supply in exchange for drugs instead of common currency.

106.    Based on my training and experience, I know that drug traffickers and drug users typically use cellular telephones in order to facilitate drug transactions, including to order and take orders for controlled substances or to set up shipments. I am aware that items such as cell phones and US currency are often located in a residence or on an individual's person.  Moreover, in this case, evidence of drug use and firearms possession has been posted on social media sites, including Snapchat and Instagram.  In my training and experience, I know that individuals typically use their cellphones or computers to take such pictures and make these types of postings.

107.    Individuals involved in the illicit distribution of controlled substances often take or cause to be taken photographs of themselves, their associates, their property and their product and such items are usually maintained within their residence and sometimes on cell phones or computers. For example, I have seen social media photographs of HENCLEWOOD holding a large stack of cash, smoking what appears to be marijuana, and holding firearms.

108.    I know through my training, knowledge and experience that persons often utilize modern smartphones and typically have them on or near their persons throughout the normal course of daily activity. I know that persons often keep their smartphone devices and SIM cards with them on their person, inside of their residence and inside of motor vehicles, along with other regularly utilized personal affects. Similarly, I know that people often typically have credit cards and jewelry on or near their person throughout the normal course of daily activity or stored in

their homes.  Because of the highly portable nature of cellphones, computers, jewelry, firearms, and credit cards, people often take these items into vehicles and may store or leave them in their vehicles.

109.    I know through my knowledge, training and experience that the only means to utilize and post to Snapchat it through the use of a smartphone.

110.    Based on my knowledge, training and experience, and discussions with other law enforcement officers, I know that individuals involved in wire fraud and fraud and related activity in connection with access devices often keep items such as but not limited to: credit cards in other people's names, pin codes, personal identifying information of victims or co-conspirators, checks in other people's names and ledgers with account numbers in their homes. I know that individuals keep such items inside of their homes due to the greater expectation of privacy inside of one's home, instead, for instance, on one's cellphone, to better shield their criminal activity from law enforcement.  Based on my training and experience, I know that individuals involved in wire fraud and fraud and related activity in connection with access devices typically use cellular telephones and other electronic devices, including computers, in order to facilitate their illegal conduct.  I know that the utilization of cellular phones is common in order to avoid law enforcement detection, by masking the facilitation of illegal activity through a commonly used device, such as a cell phone. I know that modern smartphones have similar capabilities to that of computers. Therefore, I know that consolidating the criminal activity to one or multiple phones, such as accessing online banking applications, or communicating via a variety of applications such as Snapchat, is more conducive to remaining hidden from law enforcement in public.

## **TECHNICAL TERMS**

111.    Based on my training and experience, I use the following technical terms to convey the following meanings:

    a.   Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

    b.   Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard

drives.  Most digital cameras also include a screen for viewing the stored images.

This storage media can contain any digital data, including data unrelated to

photographs or videos.

c.  Portable media player:  A portable media player (or "MP3 Player" or iPod) is a

handheld digital storage device designed primarily to store and play audio, video,

or photographic files.  However, a portable media player can also store other

digital data.  Some portable media players can use removable storage media.

Removable storage media include various types of flash memory cards or

miniature hard drives.  This removable storage media can also store any digital

data.  Depending on the model, a portable media player may have the ability to

store very large amounts of electronic data and may offer additional features such

as a calendar, contact list, clock, or games.

d.  GPS:  A GPS navigation device uses the Global Positioning System to display its

current location.  It often contains records the locations where it has been.  Some

GPS navigation devices can give a user driving or walking directions to another

location.  These devices can contain records of the addresses or locations involved

in such navigation.  The Global Positioning System (generally abbreviated

"GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite

contains an extremely accurate clock.  Each satellite repeatedly transmits by radio

a mathematical representation of the current time, combined with a special

sequence of numbers.  These signals are sent by radio, using specifications that

are publicly available.  A GPS antenna on Earth can receive those signals.  When

a GPS antenna receives signals from at least four satellites, a computer connected

to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.   PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments, or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.   Tablet:  A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen.  Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise.  Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions.  Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g.  Pager:  A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network.  Some pagers enable the user to send, as well as receive, text messages.

h.  IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

112.    Based on my training, experience, and research, I know that smartphone devices have the capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.  In my training and experience, examining data stored

on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

113.   Based on my training and experience I know that persons involved in drug and firearm related illegal activity, to include drug users, frequent swap SIM cards between readily available smartphones. I know that the use of multiple SIM cards with one or more smartphones is used in an attempt to conceal information from law enforcement, such as a person's associated use with a particular device or a particular phone number or other contact information used through smartphones, that can easily be changed by swapping the SIM cards.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

114.   As described above and in Attachment B, this application seeks permission to search for records that might be found on the PREMISES, in whatever form they are found.  One form in which the records might be found is data stored cellphones and SIM cards. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e) (2) (B).

115.   Based on my knowledge, training, and experience, I know that electronic devices, including cellphones and SIM cards, can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

116.   *Probable cause.*  I submit that if cellphones are found on the PREMISES, there is probable cause to believe that evidence of the listed crimes will be stored on that storage medium, including cellphones.  Moreover, as further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct

evidence of the crimes described on the warrant, but also forensic evidence that establishes how the cellphones were used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the cellphones because:

    a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b.  Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.   Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

117.   *Necessity of seizing or copying entire storage media.*   In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the cellphone's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

a.   The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.  Technical requirements.  Computers, including cellphones, can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.  Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

118.  *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

119.  Because several people share the PREMISES as a residence, it is possible that the PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime.  If it is nonetheless determined that that it is possible

that the things described in this warrant could be found on any of those computers or storage

media, the warrant applied for would permit the seizure and review of those items as well.

## **CONCLUSION**

120.    I submit that this affidavit supports probable cause for a warrant to search the

PREMISES described in Attachment A-1 and seize the items described in Attachment B-1.



Respectfully submitted

/s/ Patrick Dawley
Patrick Dawley
Special Agent
Bureau of Alcohol, Tobacco, Firearms and
Explosives

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim.
P. 4.1 and affirmed under oath the content of this affidavit and application.

Honorable Andrea K. Johnstone
United States Magistrate Judge

## ATTACHMENT A-1

*Property to be searched*

The property to be searched is 131 West Rosemont Avenue, Manchester, New Hampshire 03103, any outbuilding on the property to include all people and vehicles at the premises, and any cellphone, computer, computer media, and electronic media located therein. 131 West Rosemont Avenue is located on the northside of West Rosemont Avenue, between Brown Avenue and South Elm Street and is the second-to-last property on West Rosemont Avenue before Brown Avenue. 131 West Rosemont Avenue is a single-family residence with white vinyl siding, a gabled, asphalt shingled roof with a centered dormer facing the street, black shutters and a covered front porch. The residence has a detached garage at the end of a driveway along the right side of the property and a fenced in backyard with a privacy fence. The mailbox located at the end of the driveway has the number "131" attached to it.



*131 West Rosemont Avenue Street View*



*131 West Rosemont Avenue - Rear View*



*131 West Rosemont Avenue - Outbuildings*

## ATTACHMENT B-1

*Property to be seized*

1.      Controlled substances including but not limited to marijuana;

2.      Drug distribution paraphernalia including but not limited to: scales, plastic baggies, wrapping material, paper or plastic bundles, blenders, zip lock bags, presses, and cutting agents;

3.      Drug use paraphernalia including but not limited to smoking devices (commonly known as "bowls" and "bongs") and rolling paper;

4.      Devices used to communicate with other drug traffickers or buyers including cellular telephones and pagers; electronic equipment used for counter-surveillance such as scanners, police radios or monitors, surveillance cameras and monitors and devices used to store surveillance footage, anti-bugging devices and devices used to detect the presence of wiretaps, recording devices or transmitters, and/or receipts or literature describing same;

5.      Documents associated with drug trafficking including pay-owe sheets, buyer lists, seller lists, ledgers, records of sales, records of expenditures made to purchase drugs or chemicals and apparatus used to manufacture drugs, buyer lists, telephone lists, address books (written or electronic / digital media) and iPads, electronic devices, personal computers and all objects capable of storing financial digital data in any form used or believed to be used by HENCLEWOOD, or co-conspirators;

6.      Large amounts of currency (exceeding $500) or readily transported assets which are used as cash equivalents (cashiers' checks, bearer bonds, gold, diamonds, precious jewels, etc.); prepaid debit cards and gift cards;

7.      Materials evidencing the receipt of large amounts of cash including bank statements and related records, passbooks, letters of credit, money drafts, cashier's checks, bank checks, checkbooks, tax returns, loan statements, tax return work papers, escrow files, Forms 1099, wire transfer records, and other items evidencing the obtaining, secreting, transfer, concealment, and expenditure of money related to drug trafficking activities;

8.      Bank and other financial institution records, showing acquisition, conversion, movement, secreting, transfer and disbursement of United States and foreign currency from January 2019 to the present;

9.      Materials evidencing expenditure of drug trafficking proceeds including, purchase of large assets, including digital image storage devices, records of real estate or securities transactions, escrow files, wire transfer records, jewelry, automobiles, motorcycles, trucks, or other vehicles purchased with cash or cash equivalents; credit and debit card records, including records of purchases, withdrawals, deposits and cash advances made with credit and debit cards, and including statements and receipts;

10.     Photographs, negatives, video tapes, films, depicting the subjects of the investigation and their criminal associates, (showing association with the associates, depicting their assets or depicting controlled dangerous substances);

11.     Personal calendars, address and/or telephone books, rolodex indices and papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers and/or telex numbers, correspondences of the subjects of the investigation and their criminal associates, sources of supply, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists;

12.     Firearms and ammunition, including handguns, rifles, shotguns, and home-made firearms;

13.     Indicia of possession of the place to be searched: including articles of personal property, such as personal identification, immigration documents, personal correspondence, delivery pouches, diaries, checkbooks, notes, photographs, keys, utility bills, receipts, personal telephone and address books, and video tapes, tending to establish the identity of the person or persons in control of the areas to be searched;

14.     Keys to show ownership for storage facilities, businesses, locked containers, cabinets, safes, safe deposit boxes, conveyances and/or other residences;

15.     Items relating to the acquisition, possession, and disposition of firearms and ammunition, including but not limited to: receipts, bills of sale, gun cases, original gun packaging boxes, ammunition, ammunition magazines, holsters, targets, parts and accessories for firearms, firearm cleaning equipment, photographs and videos of firearms or of HENCLEWOOD in possession of firearms;

16.     Access devices, checks, bank records, account information, and other financial information relating to fraudulent transactions or transactions involving stolen identities;

17.     Items related to the payment, receipt, transfer, or storage of money or other things of value by HENCLEWOOD, including bank, credit union, investment, money transfer, and other financial accounts, credit and debit card accounts, tax statements and returns, and income;

18.     Bank and other financial institution records, showing acquisition, conversion, movement, secreting, transfer and disbursement of United States and foreign currency from 2018 to the present;

19.     Electronic devices, including but not limited to cellular telephones, computers, tablets, and iPads, used or believed to be used in connection with violations of 18 U.S.C. § 922(a)(6), Providing False Information to a Federal Firearms Licensee, 18 U.S.C. § 922(g)(3), Illegal User of Drugs in Possession of Firearm(s), 18 U.S.C. § 1343, wire fraud; 18 U.S.C. § 1029, fraud and related activity in connection with access devices; and 21 U.S.C. § 841, Possession of Controlled Substances;

2

20.     All records relating to violations of 18 U.S.C. § 922(a)(6), Providing False Information to a Federal Firearms Licensee, 18 U.S.C. § 922(g)(3), Illegal User of Drugs in Possession of Firearm(s), 18 U.S.C. § 1343, wire fraud; 18 U.S.C. § 1029, fraud and related activity in connection with access devices; and 21 U.S.C. § 841, Possession of Controlled Substances, involving Daquan HENCLEWOOD and occurring on or after November 22, 2017, including:

a.  Information associated with drug trafficking, including pay-owe sheets, buyer lists, telephone lists, address books, seller lists, ledgers, records of sales, records of expenditures made to purchase controlled substances, and records of expenditures to purchase products which are used in the distribution of controlled substances;

b.  Lists of customers and related identifying information;

c.  Types, amounts, and prices of controlled substances trafficked as well as dates, places, and amounts of specific transactions;

d.  Any information related to the source of controlled substances, firearms, access devices, or checks (including names, addresses, phone numbers, or any other identifying information);

e.  Information related to the acquisition, possession, and disposition of firearms and ammunition;

f.  Information related to the use of controlled substances;

g.  Information related to the acquisition, possession, use, and disposition of access devices in the name of those others than HENCLEWOOD;

h.  Any information involving the travel to obtain controlled substances, firearms, ammunition, access devices, or checks, or the transportation of these items;

i.  The travel or whereabouts of HENCLEWOOD;

j.  The identity, location, and travel of any co-conspirators, as well as any co-conspirators' acts taken in furtherance of the crimes listed above;

k.  Contact information of co-conspirators, including telephone numbers, email addresses, and identifiers for instant messaging and social media accounts;

l.  The payment, receipt, transfer, or storage of money or other things of value by HENCLEWOOD or other co-conspirators including:

i.  Bank, credit union, investment, money transfer, and other financial accounts;

ii.  Credit and debit card accounts;

3

      iii.  Tax statements and returns;

      iv.  Business or personal expenses;

      v.  Income, whether from wages or investments;

      vi.  Loans;

m.  Evidence of who used, owned, or controlled the Device, including any GPS entries, Internet Protocol connections, and location entries to include Cell Tower and WiFi entries;

n.  Bank records, checks, credit card bills, account information, and other financial information relating to fraudulent transactions and transactions involving stolen identities;

21.    For any cellphone, computer, or SIM card whose seizure is otherwise authorized by this warrant:

a.  evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

b.  evidence indicating the user's state of mind as it relates to the crimes under investigation;

c.  evidence of the times the cellphones was used;

d.  passwords, encryption keys, and other access devices that may be necessary to access the cellphone;

e.  records of or information about the cellphone's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

f.  contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing

or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

As used above, the term "access device" means any card, plate, code, account number, electronic serial number, mobile identification number, personal identification number, or other telecommunications service, equipment, or instrument identifier, or other means of account access that can be used, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer or funds (other than a transfer originated solely by paper instrument).